Good morning, Your Honor, Your Honors. May it please the Court, Mandy Lee for the student appellant K.S. I'd like to ask at this time that I reserve a few minutes for rebuttal. That's fine. The clock is counting down. The clock is counting down. Oh, yes. Thank you. A material alteration in the legal relationship of the parties exists now because the lower court has determined that K.S. is also eligible as a child with severe mental retardation. As in this Court's recent holding, Weisberg v. Lancaster Unified School District, it is immaterial whether the district argues that the placement at the time at issue here was appropriate. The only determinative factor now is that the school district refused to recognize K.S.'s additional primary disability of severe mental retardation and only did so after the special education due process decision was filed. Absent the change in disability classification, K.S. previously did not have a legal right to instruction by a teacher qualified to teach a student with mental retardation and autism. She now has that right. I'm really confused by this argument. Can we step back a minute? Yes. And you, there's, you never exhausted this problem. You never took the position that she had severe mental retardation. You always took the position that she didn't have severe mental retardation, right? That's absolutely not what the record reflects. A review of the due process complaint that we filed, which is, I believe, the second or third exhibit in the defendant's excerpt of record, you will see that one of the to assess this child for mental retardation, and in so doing, they denied her a FAPE by making the determination so that they could develop an appropriate program. What we did oppose was the, and actually, it's also raised as an issue below in the district court, where we argued vehemently that if this child was mentally retarded, then the IEP goals were woefully inadequate because they never presented this idea that this child was severely mentally retarded at a single IEP meeting. When Judge Betjepersan asked you that question, you didn't answer her, though. She asked you whether or not you argued before the ALJ that this child suffered from mental retardation. That was not your argument in front of the ALJ. That was our argument. Actually, we argued several times in front of the administrative law judge that if this child was mentally retarded, which we didn't learn from the district until after the litigation was filed, that they were taking that position, and they did so only as a litigation strategy, that the determination of the ALJ. Did you argue in front of the ALJ that there was a means available to identify whether this child was severely mentally retarded? That they should have followed the process. No. Did you make that argument in front of the ALJ? Yes, we did, Your Honor. And, in fact, we presented the initial assessment, the Kaiser assessment, that determined that the child was mentally retarded. And the district took the position. I thought Dr. Crawford from Kaiser simply said that she appears to suffer. She has signs of mental retardation. He didn't make a definitive determination. He did not. The district certainly did after the fact, after, as a litigation strategy to excuse the child's progress on the goals, which is what we vehemently opposed. We never opposed that the child be determined to be severely mentally retarded. In fact, our briefs are rampant with arguments that the child, if she is deemed severely mentally retarded. You're switching gears in the middle of your sentences. If she is mentally retarded, it's not the same as she is mentally retarded. That's right. So is your position that she is mentally retarded, or if she is mentally retarded? We are saying that this gets into one of the rubs in the case. We have never denied that she is mentally retarded. Well, you certainly couldn't tell that from reading the briefs. Well, what we argued was that under the definition, it required an intellectual quotient. But the fact of the matter is, is that it's undeniable that the legal relationship of the parties has changed as a result of this litigation. I thought some of the experts on which you were relying took the position that she was, that she was autistic, and that most of what was being presented as mental retardation was exact, in fact, the result of her autism, not mental retardation. And that if she had been trained properly, she would have made progress that she wouldn't have, that she didn't make because of her retardation, that the district says she didn't make because of her retardation. The expert testimony on that issue was limited only to whether you could diagnose this child as having mental retardation. What every single one of them said was that absent an intellectual quotient, they could not say ethically that the child had mental retardation. However, Dr. Howard Friedman, who was highly regarded by the judge below, indicated that you could give a, you could not have a rule-out diagnosis of mental retardation. So this idea that we've run from the category of eligibility of mental retardation is a falsity that was created by the ALJ below. We argued extensively that if this child is mentally retarded, and again, we did not have definitive answers because the district only took that position after we filed due process, and they only took it so that they would have an excuse to say that she did not make progress on those IEP goals. In fact, they admitted that in the brief. If they had diagnosed her as suffering from mental retardation, would she have got, would that have changed her IEPs? Absolutely. In what way? Well, for example, we provide to the court the California Education Code. In the state of California, they have specifically carved out for children who are severely mentally retarded, that a child receive an intensive program. There was never a discussion at a single IEP meeting about this child requiring the type of intensive program required for it. Did the parents ever bring this up at an IEP meeting? They brought the Kaiser assessment. Okay. And I don't think that the parents were in a better position to know. Apparently, the district was able to bring in two experts who never even met this child to determine that not only was she mentally retarded, but that she was severely mentally retarded. So, Ms. Newman, where in the record do you raise this issue before the ALJ? Sure. Did she say that? She's asking where in the record does she raise this issue. She's asking where in the record does she cite the mental retardation argument before the ALJ. Okay. It is our closing point and our due process complaint, Your Honor, is in the defendant's excerpt of record, and I'm trying to locate that because I had it marked. Why don't you do it when you get up afterwards, okay, instead of taking your time I'm sorry? Do it when you get up on rebuttal instead of taking your time. Okay. The point here, Your Honor, is that this – what the IEP team knew at the time the IEPs were created was that she was autistic. There was never, ever brought up at the IEP team meetings until the parents brought the Kaiser assessment that the child suffered – or potentially suffered from, Judge Pai, as you're correct, mental retardation. And yet, what does the district's IEP team do? Nothing. As we drew out the chart, you saw that the IEP goals were not changed. They were rehashed. Or, where she didn't make progress, they didn't offer to up her services. They did nothing. As we sit here today, this child is still working on these IEP goals. She's imprisoned to these goals. When we look at the Ojai v. Jackson case, this court took great – in great detail described that a child only meets some of their goals. In this case, the child met almost none of her goals. I believe we quantified it as less than 9 percent, or 6 out of 33 goals in 3 years. That is a violation of the IDEA. Regardless of whether you – Mr. – would you go back to my question? Yes. If she had been diagnosed as mentally retarded, you said that she would be entitled to an intensive program. She would also be – Now, did the regulation specify what that is? Or is it just – is it just a – a educational plan that would address those particular deficiencies that were manifested as a result of her – of her mental retardation? The latter is true. California Education Code, one of the only States that actually carves out a requirement for children who are severely mentally retarded, California Education Code, Section 56030.5, states that an intensive program – but you're right. What would have happened is they would have had to develop IEP goals and a plan developed to a child who is also severely mentally retarded. But their position is that unless she has an IQ test that shows that she can't be diagnosed as severely mentally retarded. Under the IDEA – that's right, Your Honor. Under the IDEA – Under the IDEA, you're actually relying on a DSM standard. The IDEA says nothing about that. But you have some position. No, the IDEA does say that. Actually, in the definition, it requires adaptive skills and a determination of intellectual functioning. And if you look at the Ninth Circuit holding and the district court's analysis below in the Larry P. v. Riles case, there is a detailed analysis of how the definition of mental retardation came to be in the IDEA. And that definition mirrors the DSM-IV diagnosis. Does it say that you have to have an IQ test? It absolutely requires an IQ test. In the statute, it says that. In the – absolutely. It says intellectual functioning and adaptive skills. So what the district relied on were depressed adaptive skills. That doesn't say you have to have an IQ test. Intellectual functioning means IQ. There's no question that's what it means. That's an odd use of the word. But if the child can't be tested, then what? Then there's no way – there seems to be an argument against your interest. If the child can't be tested in traditional ways, then she can't be diagnosed as severely mentally retarded, then she can't get programmed for severely mentally retarded. That's your position. Well, the position in Ojai was that you look to the goals and objectives. That's what this Court held. And that's why we did such a detailed analysis of the goals and objectives that where a child – I don't understand that answer. So the answer is you look to the – when you cannot determine, although in this case, the district did determine. So they did – But you're saying it didn't determine. Your whole brief is directed to the fact that it didn't determine and it can't be relied on. But the district court and the administrative law judge did find that she is severely mentally retarded. But your position is she isn't. She hasn't been proven to be. Under the IDEA, because they do not have an IQ. That's correct. So the – So therefore, you can't be asking for services for her for that diagnosis, because you're saying that she doesn't have one and she can't have one. Well, under the IDEA, what we were asking the district court and the ALJ to do, which the ALJ refused to do, if you look through his orders, there's not a single analysis dedicated to the failure of this child to meet her IEP goals. Not one single. In fact, when I asked the ALJ to allow me to question Bryna Siegel on the IEP goals, he refused. He refused to allow me to question the district's experts on whether it was appropriate for a child with this level of functioning to have these IEP goals. And I – The reason I did that specifically, and I provided to the ALJ the authority of County of San Diego and the Ojai v. Jackson case, which is the authority in this circuit, and the judge refused to hear that. His response to me was, I don't agree that IEP goals are the central basis by which you prove that a child has received a FAPE. Are you relying on Larry P.? That's correct. But Larry P. says that IQ tests cannot be taken to adjudicate the mental acuity of African Americans. That's right. But in the – So then how can that be a holding that IQ tests are required? Well – Please explain that to me. Sure. In the – in the analysis that the district court did in Larry P., the judge did a very detailed historical review of where the definition of mental retardation in the IDEA came from. And in that review, and also actually in the Gregory K. v. Longview case, which we cite for the court – One case. Yeah. In Larry P., Your Honor, the judge looked at the history of the definition of mental retardation and wrote in the decision, the district court, that the – Why are we concerned with that? You're citing the court of appeal. Well, I'm – because the historical basis by which the – I'm saying Larry P. says we cannot determine cognitive disability or mental retardation. It means the same thing without an IQ test. Intellectual functioning. But Larry P. doesn't require that, doesn't – doesn't hold that. It holds something else. Well, that's the holding. What we're looking at is the review. Oh, I see. Right. I'm looking at the history. But the holding of Larry P. isn't applicable to that determination. That's correct. But the history of where the definition came from is found in the district court case. Ms. Lee, did you want to save some time for rebuttal? I do. Just lastly, I just wanted to point out that as we – in conclusion, as we sit here today, the legal relationship of the parties has changed. K.S. requires a program for a child with both autism and severe mental retardation, and we believe that she is the prevailing party. Once again, I do not understand your argument in that regard, because your position all along has been that he has not been and cannot be diagnosed as having severe mental retardation. So why is he entitled to a program for such a person? Because the district's – the district has now determined that this child is mentally retarded. I'm not accepting that determination. Well, even if you're – I'm arguing against it all the way through. If you don't accept the determination that this child is not – You are not accepting the determination. I'm not saying that I don't. I have accepted the determination, or I wouldn't be here making this argument. I mean, why are you standing us telling that you can't get such a determination without an IQ test? Under the – under the law, under the legal definition, we did argue that. But we also argued that to the extent that the district may defining that the child is severely mentally retarded, there has been a change in the legal relationship of the parties, and under Weisberg, K.S. should be deemed the prevailing party. I don't quite understand. You mean for attorney's fees? For purposes of development of an entirely new IEP. For purposes of a – So this is something that occurred after – after the second remand? Actually, in our briefs, we point out that Sue Clare, the district's school psychologist, derived at the first time this idea that the child was unquestionably, her words, severely mentally retarded. Okay. All right. Let's hear from the district. Pardon me. Let me ask you one question. Ms. Lee, please. Yes, Your Honor. That last thing that you mentioned from your brief, is that in the record of this case? The last thing regarding Dr. Sue Clare? Yeah. Absolutely. Absolutely. Give me a page of citation. Okay. Absolutely. Where Dr. Clare states that this child is severely mentally retarded? Sure. Thank you. Good morning. Amy Levine, appearing for Fremont Unified School District. I think my comments here will be relatively short because I'm surprised to hear that much of what I was planning to argue about the student actually having the indicia of severe cognitive disabilities is something that's now conceded by the attorney for the student. What she is attempting to do here is put the cart before the horse, and this seems like this is an issue about fees and not about liability, and we're here today on liability. It's true that the issue of whether the student had severe mental retardation was not an issue that was exhausted below. The eligibility category is an issue that can be adjudicated by the administrative law judge and was never an issue identified by the student for the due process hearing. Correct me if I'm wrong, but I thought the whole issue of her mental deficiency as reused by the district court and by the ALJ was as they looked at the IAP and how she achieved the goals is that they said that in light of her condition, her severe mental impairment, that the goals were set for that and her condition didn't allow her to meet those goals. Is that my misunderstanding? No. That essentially was the issue. We got to the district court following the first hearing, and Judge Yelston had a question regarding whether or not there was ‑‑ whether the progress that K.S. had made was meaningful for her, and that, in her mind, turned on whether or not she had greater capacity to learn than what everyone had assumed to be her capacity. I mean, leaving aside for the moment whether it was raised or wasn't raised, what about the ultimate position that if she was, in fact, severely mentally retarded, that that should have been identified by the district as a condition for which she was entitled to educational benefits and that the benefits should have been addressed to the severe mental retardation and not only to the autism? It sounds plausible to me, leaving aside whether it's been raised properly. Well, labels are not really important here. And, in fact, the student conceded that whether or not she should be determined mentally retarded was not an issue for a hearing. That's in the remand decision, and it's in the prehearing conference order. It, you know, basically the district had all along, based on all the information that it had available to it, operated under the assumption that regardless of what her label was, that this was a girl with significant limitations in her ability to learn. But, and I really haven't traced this down, but I gather there's an argument being made that if she had severe mental retardation, then there is something in the statute that requires essentially a more functional approach. What I understand basically what you're saying is forget about the APDs and the numbers and, you know, teach her to brush her teeth and take care of herself. Well, like I said, the IEP was designed for her needs in mind. They knew that she was years below in her adaptive functioning skills. They knew that she was, when she came to them, that she was nonverbal. They created an intensive program for her. She was in a special day class for about six hours a day. She had ‑‑ it was a language-rich program. It was ‑‑ it had occupational therapy and sensory needs built into it. She had adaptive living skills goals like using additional ‑‑ But is there any specific provision with regard to severe mental retardation in the California statute? Is there such a ‑‑ is there any special rule in the California statute for children with severe mental retardation? Not as to what the program is specifically to look like. Not that I'm aware of. What is the provision, then? You know, this is not something that we've even briefed, but I think that I would accept that counsel's representation that there needs to be an intensive program. This is an intensive ‑‑ this was an intensive program. I was going to say, what's the difference between an intensive program that the regs or the statute, California regs or statute, might require for somebody who's deemed or diagnosed as severely mentally retarded and the program that she was given? I don't really think there is a difference because, again, this was all based on somebody operating at a level that everybody knew to be at a low functioning level. She was given goals designed, for instance, to address her aversion to certain foods. She was given goals on toileting. She was given functional academics on learning how to count, on learning some basic sight words, on learning how to recognize her name and to trace the letters in her name. Those are all goals that are adapted to somebody who's functioning at a severely impaired level. There was ‑‑ I don't think it would have been any different. Let me ask you another question. How do you respond to Ms. Lee's argument in her brief where she says, each one ‑‑ we're looking at a three‑year period, as I recall. And she says, well, the IEP goals for year one were set at this. Year two, they're just rehashed. They're the same thing. And at year three, they're very similar to what they were in year two. She says there's no ‑‑ there was no progress. And in developing subsequent IEPs, the district didn't adjust, change, try to take account of her lack of development or a lack of progress. How do you respond to that? Well, the progress that she made was meaningful for her. And that was the testimony of the educators who worked with her. That was the testimony of our experts. Even one of the twice that there was progress made, and the district court did too. For example, when she came into the program, she was nonverbal. By the time she left the program, she had emerging verbal skills. She had progress on her gross motor skills. She had progress on her fine motor skills. There was nothing in the record to contradict the evidence about her gross or fine motor skills, because they never had a witness to address those issues. She made progress in ‑‑ her goals went from learning certain letters of the alphabet to then having mastered all the letters of the alphabet where she could recognize them to learning certain sight words. So there was an evolution. It was slow, because this is a severely impaired child. But I think our brief sets out in some detail that there were many, many changes to the goals over time. Goals were added, and goals were changed. What was? If I may just finish that thought. There's a difference between, for instance, being able to receptively understand certain information and being able to express it. And there's a difference between being able to do something with multiple prompts and being able to do something with just a single prompt or two prompts. And so that's what the progress was for this child. What fundamentally was the difference between the parents and the school district? What did the parents want? What were they arguing for? Their fundamental concern was on speech. They wanted more speech therapy. And there were a couple of times during the course of this where they said that, you know, it's all about speech, that's all we want. And so all the other issues were really fallen by the wayside. To address the Weisberg case briefly, this case actually said that the eligibility, what type of disability a student is labeled with as part of their eligibility classification is not required by the IDEA. And so the failure to have the district have properly identified the student one way or the other is not a denial of FAPE. That's an attorney's fees case and we're not at the attorney's fees level. And in that instance, there was a judicial imprimatur on this idea that there had been an erroneous eligibility category assigned because that was the issue litigated and that was what the ALJ found. We don't have that here because that was something that was never litigated. So that case does not get JS anywhere. Did the district at any point ever diagnose her or classify her as severely mentally retarded? I couldn't say that she'd been diagnosed that way because again, we've never been able to get an IQ test from her and that's undisputed. Everyone who's tried has not been able to do that. The district Well, the other doctors seem to say you can get a fairly good indication of what her IQ is. Their doctor? Well, I guess it was in the record there's some doctors that say you can look at multiple things to have an idea, to get a fairly good sense. That's true. That's true. The testimony, the expert testimony was that she was in the severe to profound mentally retarded range. That was something that Dr. Susan Clare said. That was something that Dr. Bryant and Siegel said. Their expert, Dr. Friedman said that she was based on an extrapolation from the Vineland test that she was functioning somewhere between 20 and 60% of her chronological age. Their other experts didn't really contradict that. They said, well, we can't know without an IQ test. One of them said they would defer to Dr. Crawford. Dr. Crawford, in fact, actually did also say that she had, I believe he said that she had severe mental retardation. That was his testimony. So why wasn't that, let me ask you, why wasn't that enough for the district to take another look and say, well, is this child really just severely mentally retarded? Well, for one, it didn't really matter because they already had an eligibility determination and the obligation is to address all of her educational needs regardless of the label. If she had an orthopedic impairment but she was classified as autistic, we would address that as well. So it was not really important. The important thing was to take all the information that it had, which included at a certain point in time the Kaiser assessment, but also included its own attempts to test, the previous school district's attempts to test, the information based on her progress on her goals and in the classroom, and put together a program that addressed those needs. And there's no way around the fact that that program did address severe cognitive impairments. Can I ask you one thing that, one argument that was raised, and Ms. Lee didn't address it, but I'm just kind of curious. There's an argument by Ms. Lee that ALJ was biased. And she points to some notes and some other information that seem to reflect the ALJ's kind of perceptions and assessment of the case. Do you know how they, how, where did that come from? Well. Did he just give them to you guys or? Oh, where did it come from originally? Actually, yes, it was turned over as part of the administrative record. Okay. And that's not necessarily what typically happens, but it did in this instance. It was just part of the record that he, when they compiled it. Right, right. But it wasn't something, I believe, that was admitted into the. District court. Into the district court. Right, the district court didn't. But I was just curious how it came about that they were even revealed. Yeah. I mean, it would be interesting if, when I was a district court judge, if my notes on many of my cases had been disclosed to the party. Yeah. And, you know, and it wasn't even when it came back to remand, it wasn't something that the student raised to, you know, there was no attempt to disqualify the judge at that point in time. And I think the fact that somebody starts to formulate an opinion as they hear the case doesn't mean that they've prejudged the case. Okay. And so I, let me ask you something. If these notes were not made part of the district court record, either before the remand or after the remand, why are we discussing them here? Other than the question? I was just curious. I didn't raise it. And I think that's a good point. Yeah. I believe that we received them as part of the record. And I, my recollection is that they were not admitted by the district court judge, but I think that there was also an issue about his qualifications. There was evidence about his qualifications that was subpoenaed and there was attempt to have that made part of the record. So, you know, I obviously, to the extent it's not part, it wasn't part of the record, it should not be considered here. Was a motion made to admit them to the district court? There was a motion made regarding his qualifications. And what happened to that motion? And that was denied. But it was denied, but nonetheless, Ms. Lee is arguing that those qualifications are before us.  We'll ask Ms. Lee where she gets that information. Okay. I think your time is just about up, unless you've got anything else you want to say. I think those are the main points. Thank you very much. Thank you. We'll hear from Ms. Lee. We had about two minutes on rebuttal. Perhaps you could pick up with that last question I had. If the notes were not part of the record before the district court and you are appealing from the district court's judgment, and if the qualifications of the ALJ, which was cited at your citation, ERA 821-824, were not really before the district court because the district court denied your motion, aren't you citing two things that are outside the record and therefore in violation of our rules? Well, actually, the motion to supplement is part of the record. We presented the motion and we're appealing. But did you appeal from the denial of it? We are, as part of this appeal, correct. Is that in your brief? Yes, that is in the brief. The — and as Ms. Levine correctly noted, the entire record was presented to the district court, including the notes. Don't squiggle around that way. What record? The ALJ record, the administrative record? Oh, the record before the district court. Define your term, please. So the way that the record is moved along the chain, so to speak? The OAH provides us with an entire transcript. You're not answering — continuing to do what you've done several times. I apologize. Please answer the question. The entire record, including the judge's notes. The entire record. The ALJ record contained the notes of the ALJ and his qualifications, true? Only the notes. Only the notes. The qualifications of the ALJ were presented by motion to the district court, and the motion was denied by the district court. That's correct. They are not in the record, correct? They are not in the record. They are in this record as part of the appeal. Did you appeal from that order of the district court, denying your motion to supplement the record? No. Well, then what are you even discussing? That wasn't a final decision, Your Honor. The case was still — still — there's no basis for us to appeal the motion. But I'm asking you, where do we appeal in this appeal from that? That's right. Where? Where do we appeal the judge's credentials? Yes. The denial of the motion. It's in our brief. Where? And yet — I had asked you for something else earlier. I don't know if you have. I want to give you those citations really quickly. I gather it's part of head note H in your brief. I see the head note, but I'm looking for the actual statement that there was a denial in that you're appealing from it. That's correct. It's part of head note H. But where is it? I'd have to look. I'm sorry. I don't know the specific. The answer is it's not there. I've looked. I'm not sure that it's there. I don't have it. Unfortunately, I've cited a lot of things in the brief, but I did not — or prepared a lot of things, but I don't have that. I did want to answer the questions about the unquestionably severe mental retardation issue that Judge Bea posed. So in the district's excerpt of record, it is at 2230. So you will see that K was not assessed in all areas of suspected disability. It's page 20 of our initial due process complaint. And we specifically stated that pursuant to the IDA, mental retardation are both categories of eligibility. K was never assessed by the district for mental retardation. By failing to conduct these assessments, K has been harmed by not determining all of her areas of needs and methods by which she can benefit from her education. That issue was before the ALJ, and apparently he didn't care to review that. Also in the district's excerpt of record, you asked me about the experts for the district who are saying that the child was unquestionably mentally retarded. There are two places. One is in the district's excerpt of record at 101. There's a line of questioning to Bryna Siegel, their expert, who says that she unquestionably determined that K.S. is severely mentally retarded. Dr. Suclair also said that the child's mental retardation was severe. It's in the OEH-1 decision. And the ALJ admits that Dr. Suclair testified that the child's IQ was between 25 to 30, which we know is severe mental retardation. So this issue is all over the administrative record. And then, Judge Berzon, you were asking about what the parents want. And I think it was really explained well in our excerpt of record at ER-189 in Volume 2. The parents completed a student profile sheet, and in there they outlined exactly what they were asking for the district for years. And it wasn't just speech. It was to help their child live in the world that we all have to live in with some meaningful benefit. And now that we have the district saying that this child is severely mentally retarded, Weisberg does not require that you look at whether these items were provided or not, whether they were addressing her needs. What Weisberg says specifically is that once you determine that a child has a dual eligibility category, such as what happened here, then the child has legal rights which have changed as a result of the litigation. That was not just a case of self-help. What are you asking for from us? We're asking for you to do what the court did in Ojai, to give this child an intensive program involving one-to-one instruction so that she can have basic living skills taught, not what is the color red, what is the color blue, how to brush her teeth, comb her hair, behave in public, those kinds of things. So those are the things that we cite cases in all of our briefs, the self-help skills that she desperately needs today. Okay. Thank you, Your Honors. Thank you. Case is submitted. Thank you.
judges: Paez, Berzon, Bea